Johnny REYNOLDS, et al., Plaintiffs,

v.

ALABAMA DEPARTMENT OF
TRANSPORTATION, et al.,
Defendants.

No. CIV. A. 85–T–665–N.

United States District Court,
M.D. Alabama,
Northern Division.

March 3, 1998.

Robert L. Wiggins, Jr., Ann K. Wiggins, Russell W. Adams, Abigail P. Van Alstyne, Kimberly C. Page, Scott Gilliland, and Kell A. Simon, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Johnny Reynolds, plaintiff, and Cecil Parker, Frank Reed, Ouida Maxwell, Martha Ann Boleware, Florence Belser, Peggy Vonsherie Allen, and Jeffrey W. Brown, intervenor–plaintiffs.

Claudia H. Pearson, Nakamura & Quinn, Birmingham, AL, for Robert Johnson, intervenor–plaintiff.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for William Adams, Cheryl Caine, Tim Colquitt, William Flowers, Wilson Folmar, George Kyser, Becky Pollard, Ronnie Pouncey, Terry Robinson, Tim Williams, intervenors.

Raymond P. Fitzpatrick, Jr., R. Scott Clark, J. Michael Cooper, Fitzpatrick, Cooper & Clark, Birmingham, AL, for Michael Grant, John D'Arville, and Andrew McCullough, intervenors.

Thomas R. Elliott, Jr., Allen R. Trippeer, Jr., Lisa W. Borden, C. Dennis Hughes, London & Yancey, Birmingham, AL, and William H. Pryor, Jr., Atty Gen. for the State of Alabama, Montgomery, AL, for Alabama. Dept. of Transp., Alabama State Personnel Dept., Jimmy Butts, in his official capacity as Director for Alabama Dept. of Transp., Halycon Vance Ballard, in her official capacity as Director of the Alabama State Personnel Dept., and Fob James, in his official capacity as Governor of the state of AL, defendants.

William P. Gray, Jr., Gray & Jauregui, Montgomery, AL, for Fob James, in his official capacity as Governor of the State of Alabama, defendant.

Elaine R. Jones, Norman J. Chachkin, NAACP Legal Defense Fund, New York, NY, for NAACP Legal Defense and Educational Fund, Inc., amicus.

**1132**

Barbara R. Arnwine, Thomas J. Henderson, Richard T. Seymour, Teresa A. Ferrante, Lawyers' Committee for Civil Rights Under Law, Washington, DC, for The Lawyers' Committee for Civil Rights under Law, amicus.

### ORDER

MYRON H. THOMPSON, Chief Judge.

The history of this 13–year–old lawsuit—in which African–American plaintiffs have charged defendants Alabama Department of Transportation and Alabama State Personnel Department with employment discrimination—documents a struggle to create a Transportation Department where merit is considered and evaluated in a color-blind fashion, so that opportunities are equally available to qualified candidates. A 1994 consent decree, commonly referred to as 'consent decree I,' set up an *open and competitive* system in which persons, regardless of race, could pursue and be considered for promotions, both provisional and permanent, on the basis of merit.[1]

Currently before the court are the plaintiffs' motions for an injunction permanently prohibiting the Transportation Department from perverting its employee grievance procedure into a tool to allow supervisors again to engage in the secretive and non-competitive selection and promotion of employees. Under the challenged grievance procedure, according to the plaintiffs, a favored employee whose supervisor has selected him or her to fill an out-of-class position would file a grievance to be provisionally promoted to the new out-of-classification position and possibly receive backpay from the time of the appointment, the employee and the supervisor would then enter into a 'settlement' of the griev-

ance, and the employee would then receive a provisional appointment, with backpay, to the position pursuant to the so-called settlement agreement. Employees whom their supervisors disfavored, for whatever reason, could not compete for the position, no matter how well qualified. The plaintiffs maintain that to allow the grievance procedure to be used in this manner would be to allow the procedure to become essentially a closed and non-competitive means for friendly promotions. Indeed, according to the plaintiffs, three white employees—Andrew Grant, Michael McCullough, and John D'Arville—have attempted, and hundreds of other employees are attempting, to have the grievance procedure used to this very end.

For the reasons that follow, the court finds that the use of the grievance process in this manner perpetuates practices forbidden by consent decree I and condemned in another longstanding, companion case, *United States v. Frazer*, civil action no. 2709–N (M.D. Ala.).[2] For this reason, and with the goal of creating a level playing field in the Alabama Department of Transportation always before it, the court grants the plaintiffs' motions for permanent injunction, albeit only to the extent of giving declaratory relief.[3]

### I. BACKGROUND

This lawsuit, filed by African–American applicants and employees of the Alabama Department of Transportation alleging racial discrimination, is now about to begin its fourth year under consent decree I, a partial settlement between the parties designed to remedy past discriminatory policies and establish open and equal access to employment opportunities throughout the Transportation Department. Incorporated by reference into the consent decree are the findings and or-

---

1. See *Reynolds v. Alabama Dep't of Transp.*, 1994 WL 899259 (M.D.Ala. Mar.16, 1994) (Doc. no. 553).

2. When originally filed, this case was styled *United States v. Frazer*, civil action no. 2709–N (M.D.Ala.). It is currently styled *United States v. Ballard*, civil action no. 2709–N (M.D.Ala.), because, after December 4, 1981, Halycon Vance Ballard replaced John S. Frazer as the named defendant in the case.

3. See plaintiffs' motions for preliminary injunctions, filed March 10, 1997 (Doc. no. 1635) (treated as a motion for permanent injunction pursuant to order entered March 11, 1997 (Doc. no. 1643)), and March 28, 1997 (Doc. no. 1716) (treated as motion for permanent injunction pursuant to order entered March 31, 1997 (Doc. no. 1726)).

Consent decree I authorizes the parties to seek relief under the *Frazer* orders in this case. See note 79, *infra*.

ders from permanent injunctions entered in an earlier discrimination lawsuit against the Transportation Department, the *Frazer* litigation. Because the histories of these two lawsuits against the Transportation Department are so interrelated, the court will begin with an overview of the relevant history of the period leading up to both the *Frazer* injunctions and the entry of consent decree I.

*Frazer Litigation:* For the first three-quarters of this century, the State of Alabama and its agencies excluded African–Americans, because of their race, from employment other than in low and menial positions, and throughout the last quarter of this century, despite outstanding court orders, the Transportation Department manipulated, or even circumvented, State personnel procedures to avoid hiring and promotion of African–Americans into responsible and non-menial jobs.

In the late 1960s, the United States brought an action against the Alabama State Personnel Department challenging personnel practices which it contended intentionally discriminated against African–American applicants and employees. In 1970, in *United States v. Frazer*, 317 F.Supp. 1079 (M.D.Ala.), this court agreed with the United States, and found that agencies of the State of Alabama had engaged in a State-sanctioned policy of manipulating and circumventing the State's personnel procedures to avoid the hiring and promotion of African–Americans. *Id.* at 1084–87. The court found intentional, pervasive, systematic exclusion and avoidance of black employees and applicants throughout numerous State departments.

The evidence demonstrated that racial discrimination was accomplished in several ways, many of which involved manipulations of personnel practices and procedures to exclude eligible and qualified black employees from competing for jobs. The evidence overwhelmingly showed refusals to hire, or even to interview, African–Americans who had qualified and appeared on the certificates of eligibles, despite an urgent and constant need to fill positions. *Id.* at 1087. It also showed that agencies maintained racially segregated facilities in their buildings. *Id.*

Indeed, John S. Frazer, director of the Personnel Department, testified to his belief that the race of applicants was a legitimate factor for consideration in selecting employees. *Id.* at 1085.

The court found that "defendants' systematic refusal to appoint Negro applicants and their preference for lower-ranking white applicants constitute unlawful race discrimination[,] ... a clear violation of the equal protection clause of the Fourteenth Amendment." *Id.* at 1089–90. The court entered similar findings on the defendants' recruitment and advertising practices.

The court entered an order broadly prohibiting State officials from "engaging in any employment practices, including recruitment, examination, appointment, training, promotion, retention, or any other personnel action, for the purpose or with the effect of discriminating against any employee, or actual or potential applicant for employment, on the ground of race or color." *Id.* at 1090. The court further imposed what has come to be known as the 'no-bypass rule,' which provides that State officials "shall not appoint or offer a position to a lower-ranking white applicant on a certificate in preference to a higher-ranking available Negro applicant, unless the defendants have first contacted and interviewed the higher-ranking Negro applicant and have determined that the Negro applicant cannot perform the functions of the position, is otherwise unfit for it, or is unavailable." *Id.* at 1091.

Six years later, in the same litigation, similar allegations were again before the court. The United States charged that State personnel practices were systematically and deliberately manipulated to prevent blacks from competing with white applicants for jobs and promotions. In an order entered in August 1976, the court found a pattern and practice of racial discrimination in employment in the Transportation Department (then known as the Highway Department). *See United States v. Frazer*, civil action no. 2709–N, 1976 WL 729 (M.D.Ala. Aug.20, 1976).

Specifically, the court found that the new defendants, including the Transportation De-

partment, "avoided compliance with the decrees in this case by examining job registers maintained by the Personnel Department of the State of Alabama and by requesting certificates of eligibles only at times when no blacks were available for certification." *Id.* at \*4. The court also pointed out other evidence of discriminatory practices, including maintaining registers on a non-continuous basis (establishing a register and not adding any persons until that register is exhausted and another exam is administered), or 'closing' a register for as long as two years. In this way, all-white registers were maintained. *Id.* at \*5–\*6. The court observed, "Progress toward erasing the effects of prior exclusionary practices upon the basis of race has been minimal and in many instances non-existent." *Id.* at \*6.

The court also recounted the story of one black applicant's attempts to obtain a position with the State, and the elaborate lengths to which the Personnel Department went to avoid him. This occurred despite the fact that he was first on the register for the position, and that the Alabama Development Office Assistant Director found him "extremely well qualified." *Id.* at \*4–\*5.

The court entered a more detailed order requiring, among other things, that defendants validate all written tests. It also ordered that State officials "shall insure that blacks who are appointed to ... job classifications common to several agencies shall be appointed to all agencies in which such vacancies occur. No defendant shall attempt to avoid this provision by deferring requests for certification until blacks are unavailable." *Id.* at \*7. One of the injunction's specific provisions required that the defendants "engage in intensive recruitment for black applicants for ... Graduate Civil Engineer." *Id.*

*Reynolds Litigation:* This lawsuit was initiated in May 1985. The plaintiffs charged that the defendants discriminated against them in employment because they are African–Americans, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, the fourteenth amendment to the United States Constitution, as enforced by 42 U.S.C.A. § 1983, and 42 U.S.C.A. § 1981. The plaintiffs represent a class of African–American merit and non-merit system employees and unsuccessful applicants. The defendants include the Alabama Department of Transportation, the Alabama State Personnel Department, and several State officials. The jurisdiction of the court has been invoked pursuant to 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 2000e–5(f)(3). The plaintiffs charged, among other things, that, despite the orders entered in *Frazer,* the Transportation and Personnel Departments continued to manipulate and circumvent State personnel procedures so as to avoid hiring and promoting blacks. Upon appropriate motion, the court consolidated the *Frazer* lawsuit with the *Reynolds* case.[4]

After some discovery, the parties reached a full settlement of this case in 1988, but the court refused to approve the proposed consent decree in the face of numerous objections from the members of the plaintiff class. *See Reynolds v. King,* 790 F.Supp. 1101 (M.D.Ala.1990). Litigation then resumed.

A trial was held in 1992 that extended over several months. The evidence presented reflected that, during the years following the court's 1976 findings in *Frazer,* defendants continued to engage in the same pattern and practice of racial discrimination. By use of these practices, the evidence reflected, the defendants could preclude black applicants from applying for the historically white job classifications for prolonged periods, extending such exclusion into the late 1980s for some larger and more important job classifications. The most obvious of these practices, condemned and enjoined in 1976, was the refusal to permit applications for years at a time while the existing register used to fill vacancies was either all-white or predominantly white. In the 1980s, when African–Americans began to apply for positions where registers had been exhausted, applicants were suddenly subjected to a battery of new screening criteria and examinations. No evidence established that these criteria were job-related, nor validated as required by the *Frazer* injunction.

---

**4.** *See* order, entered July 31, 1992 (Doc. no. 434).

For example, the first qualification imposed on applicants for the Graduate Civil Engineer positions, an entry level job, was that they graduate from an 'accredited' program, which eliminated graduates from most predominantly black schools. In mid–1979, however, a graduate of Southern University's accredited Civil Engineering program learned of a Graduate Civil Engineer job at the Transportation Department and attempted to apply for it. Josh Chapple testified at trial, and the Department's internal documents corroborated his testimony, that, instead of processing Chapple's application in the normal fashion according to the established criteria and procedures, both the Transportation Department and the Personnel Department subjected him to a series of delays and special requirements. Among them were: (1) a requirement that he pass the 'engineer-in-training,' also known as the 'EIT,' examination, though the defendants did not require that of white applicants; (2) a requirement that he take additional college course work in geology and transportation science before they would accept his application, though they did not post such course work on the job announcement or require it of white applicants; and (3) various other roadblocks catalogued on a daily basis in a Transportation Department internal memorandum dated November 3, 1978.[5] In another, later in-house memorandum, dated March 16, 1984, the Transportation Department's minority recruiter wrote: "[A] door to potential black [Graduate Civil Engineer]'s from predominantly black Southern University was slammed when, on November, 1978, the qualifications which had been sufficient for many years for white [Graduate Civil Engineer]'s were found to be unsatisfactory" for the first black applicants who satisfied them.[6]

Finally, when two African–American applicants on the register were to be hired because of the no-bypass rule of *Frazer*, and ten more African–American graduates appeared on the Graduate Civil Engineer employment register, the defendants suddenly abolished the register. The new job announcement included the EIT test as a posted requirement. The defendants, in an unabashed echo of their earlier racially discriminatory treatment of Chapple, declared the ten African–American applicants ineligible to reapply, despite their having successfully competed and ranking high enough on the register to be selected and despite the affirmative duty placed on the defendants by the *Frazer* injunction to "engage in intensive recruitment for black applicants for ... Graduate Civil Engineer."[7] *Frazer*, 1976 WL 729, at *7.

Chapple's story is one of the most compelling. But there was testimony from other witnesses of numerous other instances of racially discriminatory employment practice— far too many instances to recount here. One example, however, was plaintiff class member Ganiu Alabi.[8] Alabi testified that in spite of his qualifications, which included college degrees in petroleum and civil engineering, passing the EIT exam, and teaching labs for college engineering courses, his applications with the Transportation Department for civil engineering jobs were repeatedly denied. Instead, he was hired as an Engineering Assistant I, a position which requires only a high school diploma, in a geographic area more than 150 miles from his home. Neither his supervisor, his supervisor's supervisor, nor his supervisor's supervisor's supervisor had a college degree in engineering. In addition, Alabi rode in a Transportation Department truck from Fort Deposit, Alabama, to his work site with his supervisor throughout the year of his employment. His supervisor refused to permit him to ride in the cab of the truck, though it was not occupied. From the driver's seat, the supervisor would

---

**5.** Plaintiffs' supplemental memorandum in support of the goals of proposed consent decree, filed March 7, 1994 (Doc. no. 538), appendix A.

**6.** *Id.*

**7.** This event was described in the March 16, 1984, memorandum as follows: "Perhaps the most indigestible example of practices which negatively affect minority employment is the one

in which the [Graduate Civil Engineer] register which included ten minorities was abolished on March 30, 1983 by the apparently arbitrary inclusion of the requirement that the EIT examination be passed." *Id.*

**8.** *See* transcript of third day of trial, held June 17, 1992, at 3–56.

spit tobacco juice out the window, striking Alabi in the face. Alabi described the insulting incident as follows:

> "[MR. ALABI]: . . . [The supervisor] chews tobacco and makes sure to spit it out while the truck was in motion. I ended up with most of the juice in my face.
>
> "[PLAINTIFFS' COUNSEL]: Did you complain about that?
>
> "MR. ALABI: Yes, I did.
>
> "[PLAINTIFFS' COUNSEL]: Yes, you did?
>
> "MR. ALABI: He told me, 'tough shit, it was a privilege to ride in the truck, not a right.' " [9]

In addition to these insulting behaviors, Alabi's supervisor also expressed his opinions that blacks with engineering degrees were inferior to whites with similar qualifications, and that blacks were lazy and sat around watching television and collecting welfare. Finally, despite Alabi's continuing attempts to be considered for engineering jobs better suited to his qualifications, and despite a transfer to another area, he had not, at the time of the 1992 trial, been considered for an entry level engineering job. He was not even promoted to an Engineering Assistant–II. He left the Transportation Department for a engineering job with the Alabama Department of Natural Resources.

Other evidence established that the Transportation Department had posted no job announcements, nor received applications in certain job categories, for as long as seven years, far longer than the two years that the court condemned as discriminatory in *Frazer*. For example, the defendants refused to receive applications for Civil Engineer–I and -II positions from 1974 to 1987, except for one three-week period in 1979 and a second three-week period in 1984. The defendants still did not take Civil Engineer–II applications up to the entry of consent decree I—opening that classification for only nine weeks in 20 years. Similar statistics were presented for many other job classifications. Evidence also showed maintenance of multiple registers, which supervisors could preview before determining from which to fill a job and which they could then use to manipulate the selection process so as assure the selection of persons whom the supervisors wanted, despite the relative qualifications of those under consideration and despite any roadblock the no-bypass rule might have place in the selection process.[10] The 1976 *Frazer* injunction specifically condemned previewing registers. *Frazer*, 1976 WL 729, at *4.

The trial ended before completion when the parties announced that they might be able to settle the litigation again. In 1993, the parties reached a second, albeit only partial, settlement. In the wake of this new partial settlement, the court allowed a group of non-class members—consisting mostly of white employees of the Department of Transportation and now commonly referred to as the 'Adams intervenors'—to intervene and challenge any race-conscious provisions in the settlement. *See Reynolds v. Roberts*, 846 F.Supp. 948 (M.D.Ala.1994).

The new partial settlement was submitted to the court for approval in 1994. One part of the settlement was approved by the court and incorporated into consent decree I. The court has reserved ruling on other parts of the settlement. Consent decree I required that the Transportation and Personnel Departments establish, in a timely manner, new, non-discriminatory personnel procedures that would allow African–Americans and all other employees to compete for positions, openly and fairly, without regard to

---

**9.** *Id.* at 20–21.

**10.** Multiple registers were formed simultaneously for certain job classifications with applicants being eligible for each register on the basis of different entrance requirements. The types of registers formed simultaneously for a single job classification included: (a) open-competitive registers; (b) promotional registers; and (c) reemployment registers. Applicants are determined to be eligible for each of these types of registers on the basis of different criteria. Applicants eligible for both an open-competitive and a promotional register would be ranked on both, but their scores and ranks on each register could, and often would, be different because the scoring procedures differ from one register type to another and the number and identity of persons on each type register are different. An applicant who is ineligible for one type of register could be eligible for the other type.

race. The decree provides detailed requirements regarding, among other things, recruitment (article I), training (article XVI), and the establishment of open and fair hiring and promotion procedures (articles II, III, IV, VI, VII, VIII, IX, X, and XIV). These requirements would, among other things, significantly restrict any opportunity for the Transportation Department to manipulate and circumvent personnel procedures in the future so as to avoid the hiring and promotion of African–Americans. Because time was of the essence—it was important not only to abolish immediately the Transportation Department's discriminatory procedures but also to establish new non-discriminatory ones with some urgency—the decree set time limits for compliance. In other words, the Transportation and Personnel Departments were required, within a certain period of time, to redress the past effects of their racially discriminatory policies and practices *and* to create and implement a personnel system that would be fair and open and that would restrict the two departments' opportunities to continue to discriminate against African–Americans.

*Plaintiffs' Motions for Permanent Injunction:* The issue of the possible abuse of the Transportation Department's grievance procedure through so-called private settlements between employees and supervisors—in which employees would gain provisional appointments, with backpay, pursuant to these settlements and outside the competitive promotion process—was first brought to the court's attention, not by the plaintiffs, but rather by the defendants, through a motion filed on January 14, 1997, to enjoin these grievances and for protective order.[11] The court entered an order on January 22, 1997, denying the motion and stating that it had no role at that stage in the revised grievance procedure, and, as to the protective order, that the matter was premature.[12]

However, upon imminent implementation of the remedies offered to three grievants—Andrew Grant, Michael McCullough, and John D'Arville—the plaintiffs filed a motion for a temporary restraining order, alleging those personnel actions pursuant to settlement agreements in the Grant, McCullough, and D'Arville grievances would violate the decree and other court orders.[13] The settlement relief offered to the grievants included retroactive provisional appointment to a promotional position and backpay. By orders entered on February 27 and March 11, 1997, the court granted the motion.[14]

On March 10 and 31, 1997, the plaintiffs filed additional motions for temporary restraining order and preliminary injunction requesting that the court enjoin any grievances settled in step one of the grievance process simply by agreement between a supervisor and a grievant.[15] They argued that vesting the authority to grant appointments and backpay in supervisors creates the opportunity for circumvention of the merit system and the consent decree, and allowed for the exchange of favors among supervisors. The court treated these additional motions as ones for permanent injunctions and set them for final hearing.[16] In the meantime, on April 9, 1997, the court entered a preliminary injunction essentially extending the temporary order.[17]

The plaintiffs initially framed this issue as a challenge to the application of the grievance process in three individual cases, and the conflict created between the grievance process and certain provisions of consent decree I and orders enforcing the decree. During the initial four-day hearing and a three-day supplemental hearing, the evidence presented compellingly proved the significance of this matter to broader issues in this

11. Doc. no. 1477.

12. Doc. no. 1498.

13. *See* motion for temporary restraining order, filed February 26, 1997 (Doc. no. 1585).

14. *See* Doc. nos. 1587 and 1644.

15. *See* motion for preliminary injunction, filed March 10, 1997 (Doc. no. 1635), and motion for

temporary restraining order and/or preliminary injunction, filed March 28, 1997 (Doc. no. 1716).

16. *See* orders entered March 11, 1997 (Doc. no. 1643), and March 31, 1997 (Doc. no. 1726).

17. *See* order and preliminary injunction, filed April 9, 1997 (Doc. no. 1760).

lawsuit beyond the structure of the grievance procedure, implicating the most basic and critical underpinnings of the decree.

The Adams intervenors, who support the continued use of the grievance process in this manner, maintain that the basis for settlements offered to these grievants by their supervisors is the assignment to 'out-of-classification' positions, which the grievants contend violates article XV, ¶ 4, of consent decree I. Paragraph 4 states:

> "Duties within the job description: The Highway Department will monitor the duties and responsibilities performed by employees with the goal of assuring to the extent practicable that at least 90% of the duties and responsibilities performed by employees on a regular or non-emergency basis are within the job description for job they are holding."

This 90% requirement, according to the Adams intervenors, requires that these grievants be provisionally appointed to the positions they hold out-of-class. They submit that black grievants were awarded similar relief on those grounds, and that they are entitled to the same treatment. The plaintiffs contend that the grievances by the black employees were not based on violations of ¶ 4 of article XV, but on findings of racial discrimination and wrongful denial of positions for which the black employees had competed.

The defendants join the plaintiffs in contending that complaints about out-of-classification assignments should not be resolved through the grievance process, and thus the defendants agree, in the words of defense counsel, that the court should "stop the [grievance] procedure for everyone right here, both black and white." [18] The defendants acknowledge that should these grievances be found valid, there is the potential for hundreds of grievances by both black and white employees on the same basis—that is, working in out-of-classification positions. They disagree with the plaintiffs, however, on any other limitation on the availability of the grievance process. Finally, the defendants propose that the article XV reclassifi-

cation project, rather than the grievance procedure, be used to adjust permanently the classification of approximately 400 employees working out-of-classification.

The plaintiffs respond that reclassification, as the defendants and Adams intervenors would apply it, is equally violative of consent decree I. The core of the problem, as the plaintiffs present it, is the initial 'assignment' of out-of-classification positions, a process that, the plaintiffs claim, circumvents and violates specific decree provisions, as well as its intent and purpose. The plaintiffs argue that to assign duties and responsibilities and then award promotions, even provisional promotions, or reclassifications, on the basis on those assignments, rather than opening the positions for a competitive selection process, defeats a primary goal of the consent decree: to eliminate past practices which prevented fair competition between qualified employees.

## II. DISCUSSION

### A.

The plaintiffs argue that the provisional appointments of Grant, McCullough, D'Arville, and potentially hundreds of others, pursuant to private, closed, and essentially friendly grievance settlements, either violate, or stem from violations of, article I (recruitment), article IV (provisional appointments), article XI (proportional assignments), article XIV (rotation of job duties), article XV (reclassification), and article XVI (training). Most significant, they argue, is that these violations, in sum, destroy perhaps the most fundamental purpose of the decree, as expressed by article XIX, ¶ 6(d):

> "It is the intent and purpose of this Decree to undo the effects of the past practices which have been the subject of this case and Decree and to prevent further practices which may perpetuate such eff[ects] or otherwise discriminate against the plaintiffs or the class they represent. To the extent that this Decree fails to achieve the intent and purpose for which it has

---

**18.** Transcript of first day of hearing on plaintiffs' motion for permanent injunction, held March 24, 1997, at 33.

been entered, the parties may seek further relief from the Court."

As to whether out-of-class appointments or reclassifications violate this quoted provision, perhaps the most compelling testimony was that of Don Arkle, the Alabama Department of Transportation Design Bureau Chief, who is white. Arkle testified that one of the best features of the consent decree is its insurance against the pre-decree practices which allowed supervisors and employees to circumvent the merit selection process then in place, and to promote employees based on personal bias or other non-merit criteria. Testimony presented to the court during the 1992 trial—for example, that of Ganiu Alabi recounted above—which led to the entry of the consent decree, strongly suggested that one criterion often used by supervisors and employees in this hidden and biased manner, was race. The exchange in open court with Arkle was as follows:

"[PLAINTIFFS' COUNSEL]: And you testified that you're knowledgeable that the Decree was intended to end the practice of circumventing the Certificate of Eligibles in the register process, correct?

"MR. ARKLE: Yes.

"[PLAINTIFFS' COUNSEL]: And you personally think that's one of the best features of the Consent Decree, that it ends that practice.

"MR. ARKLE: Yes, sir, I do." [19]

Arkle then acknowledged that the use of the grievance procedure, as Grant, D'Arville, and McCullough would cast it, would essentially again allow supervisors and employees to circumvent the open merit-selection process, and would reintroduce the condemned non-competitive, secretive, handpicking process, albeit as a one-time event.

"[PLAINTIFFS' COUNSEL]: But now these grievances and this whole out of classification reclassification effort is going to reinstall it, isn't it?

.    .    .    .    .

"THE COURT: Let me ask this: How will it be different?

"MR. ARKLE: Well, the one time it made everybody in the proper classification they're working in.

.    .    .    .    .

"THE COURT: Other than the fact this occur[s] at one time rather than repeated occurrences, do you know of any other difference between what's being proposed here with the grievance and what was going on before in the Consent Decree?

"MR. ARKLE: I'm not sure I understand the question.

"THE COURT: Well, your answer to my question was that it was a one time occurrence. And, I'm asking, is that the only distinguishing characteristic?

"MR. ARKLE: I guess so." [20]

In other words, as previously stated, a favored employee whose supervisor has selected him or her to fill an out-of-class position, would need only to file a grievance to be provisionally promoted to the new out-of-classification position and possibly receive backpay from the time of the appointment. For, the employee and the supervisor could then enter into a 'settlement' of the grievance, and the employee could then receive a provisional appointment, with backpay, to the position pursuant to the so-called settlement agreement. Employees whom their supervisors disfavored, for whatever reason, could then never compete for such a position, no matter how well qualified they are.

The consent decree set up an *open and competitive* system in which persons, regardless of race, could pursue and be considered for promotions, both provisional and permanent, on the basis of merit. The following provisions, which the plaintiffs claim are violated by the award of out-of-class assignments, were crafted largely to accomplish that end.

### B.

■ *Article I:* The detailed recruitment provisions of article I are extensive, and their broad scope suggests that the parties took these provisions quite seriously as a remedy to their dispute. It is self-evident that arti-

19. *Id.* at 99.

20. *Id.* at 99–102.

cle I's goal is to identify and encourage qualified African–American candidates, including current employees, to *compete* for jobs within the Alabama Department of Transportation. The plaintiffs contend that, by placing employees in out-of-class vacancies, defendants violate article I provisions, a violation then compounded by awarding a provisional appointment to the position pursuant to private grievance settlements—also without any recruitment—on the grounds of that out-of-class assignment.

Arkle, the Design Bureau Chief, testified that he understood article I recruitment to apply both to the filling of 'classifications'—that is, the formal installation to a job class, such as Civil Engineer–I—and 'positions'—specific jobs or in-house job titles within the Transportation Department.

"THE COURT: Well, what does article I, according to you, apply to in particular? I'm having some difficulty seeing that. It says 'recruitment addressed to current employees reporting, regarding career paths,' is that classifications or positions?

"MR. ARKLE: No, that's classifications and positions.

.    .    .    .    .

"THE COURT: Let me put it very bluntly to you. Do you see your duty as to recruit, as that term is defined in article I, people for positions and classifications?

"MR. ARKLE: Yes, sir." [21]

Likewise, the court has held that the recruitment provisions apply to any selection process for a job covered by article I, "regardless as to whether selection is permanent, provisional, temporary, or whatever." [22] The injunction imposed by that order applies the same requirement to a selection for a 'position' as well as for a 'job' covered by article I.[23]

21. *Id.* at 90, 92–93.

22. Order and injunction, entered July 11, 1996 (Doc. no. 1131), at 3.

23. *Id.* at 5.

24. Transcript of first day of hearing plaintiffs' motion for permanent injunction, held March 24, 1997, at 93.

Arkle also confirmed that defendants had not recruited for the positions occupied by Grant, McCullough, and D'Arville, a matter about which there seems to be no dispute.

"[PLAINTIFFS' COUNSEL]: Now, you have not given any encouragement, assistance, or even notification to the black employees of these opportunities that Grant, D'Arville and McCullough have been filling, have you?

"MR. ARKLE: No, sir." [24]

The defendants argue that at least two of the three original grievants were assigned their out-of-class duties before the entry of consent decree I. However, the Transportation Department was then under the *Frazer* injunctions, which similarly required recruitment for positions, prohibited avoidance of black applicants, and imposed its 'no bypass' rule to prevent avoidance of black eligibles.[25]

■ *Article IV:* Paragraph 3 of article IV suspended the use of registers for certain job classifications pending the validation and development of new minimum qualifications for those classes. In the meantime, ¶ 2(b) of article II provides that:

"Appointments in the interim between the effective date of this Decree and the completion of the requirements of this Article [Two] shall be governed by the provisions of Article Four of this Decree entitled Implementation of Personnel Projects."

Paragraph 3 of article IV further states that "vacancies in the SPD project classes . . . may be filled by provisional appointments." In its order of September 18, 1995, the court adopted the Transportation Department's proposal for provisionally filling positions.[26] That order stated in part:

"(e) Qualifications for a position will not include experience in the job applied for where the duties of the position in question

25. As noted earlier, the court enjoined the Transportation Department from appointing a lower-ranked white applicant to a position for which there was a higher-ranked black applicant on the Certificate of Eligibles. This became known as the "no-bypass rule." *Frazer*, 317 F.Supp. at 1091.

26. Doc. no. 753.

have been performed by one or more applicants or candidates for the position while in a lower classification, unless the opportunity to perform such duties has been rotated or provided on a proportionately equal basis to black and white employees in the same lower classified job(s), and was otherwise consistent with and in compliance with Consent Decree I."

Under this provision, any competitive advantage gained by an out-of-class assignment that in any way violates consent decree I, or is not proportionally available, would be eliminated. Significantly, the prohibition draws no distinction between pre- and post-decree out-of-class experience. Such a statement can only reflect an attempt to prevent out-of-classification appointments from blocking the replacement of the former system of patronage with an open and competitive process.

These provisions of the decree and orders of the court are confounded by a procedure whereby a selective, non-competitive awarding of positions, through the assignment of out-of-classification duties, can then convert to a provisional appointment with the mere filing and settlement of a grievance.

The awarding of provisional appointments to Grant, McCullough, D'Arville, and others does not involve or take into consideration the September 15, 1995, order. That is, grievants would receive these provisional appointments on the basis of their assignment of out-of-class duties without any assessment of whether they were both proportionally available to class members *and* assigned in a manner consistent with all the provisions of consent decree I and, by incorporation, the *Frazer* injunctions.

**■** *Article XIV:* Another provision of the consent decree also addresses the prohibition on using out-of-classification assignments to circumvent the open and competitive nature of the system imposed by the decree. Paragraphs 2 and 3 of article XIV state:

"2. Assignment of duties:

"(a) To the extent practicable, the duties and responsibilities of higher classified jobs will be assigned on a proportionately equal basis to black employees compared with white employees in the same lower classified jobs.

"(b) The Highway Department will to the extent practicable not assign duties in such a way that any employee will gain an advantage in promotions, including reclassification, over other employees in the same classification.

"3. Job duties which better prepare employees:

"(a) Within 90 days following the effective date of this Settlement Decree, the Highway Department and the Personnel Department will identify the job assignments or duties within a job classification which would better prepare an employee for examination or promotion (including reclassification) than other assignments or duties within such classification.

"(b) The assignments and duties identified will include, but not be limited to, any assignment or duty which would receive a greater value or number of points in a T & E rating, a classification or pay review, or in selection from a [Certificate of Eligibles].

"(c) For each assignment or duty so identified, the Highway Department will, to the extent practicable, develop a means for assuring that employees on the job are periodically rotated into such assignments and duties and that black employees are assigned to such duties and assignments at rates proportional to their representation in the job classification." [27]

It is incontrovertible that should the Grant, McCullough, and D'Arville promotional appointments be allowed, the grievants "will gain an advantage in promotions" through the assignment of duties, in direct violation of article XIV, ¶ 2(b). Mr. Arkle confirmed that this would be the case.

"[PLAINTIFFS' COUNSEL]: Now, all of these persons that you have put in these out-of-classification assignments are gaining advantage over other people in their

---

27. Transcript of second day of hearing on plaintiffs' motion for permanent injunction, held

March 25, 1997, at 242–43.

same classification by being given the proposed reclassification, aren't they?

"MR. ARKLE: Yes, sir, but to the extent practicable, we didn't have any other option. Since we couldn't make provisional appointments, I had positions that I had to assign the duties to someone. So to the extent practical, I had to make those assignments.

"[PLAINTIFFS' COUNSEL]: But the only person that prevented you from making a provisional appointment was your own Director of the Transportation Department. He just wouldn't let you, would he?

"MR. ARKLE: I don't know the reasons at every point in time why we couldn't make provisional appointments."

As shown by this testimony, the defendants respond that they have had no choice but to work employees out of class, but they offer little evidence in that regard. Nor do they address the violation of article XIV, ¶ 2, in their briefs on these motions. On the contrary, the testimony of Mr. Arkle supports the plaintiffs' stance that these positions could have been opened for provisional appointments but for the Transportation Department's unexplained decision not to do so. Mr. Arkle testified that in 1996 he had requested to fill a vacancy in his area created by retirement, but when the request was denied, he simply selected an employee and placed him in the position.

"[PLAINTIFFS' COUNSEL]: ... When you made Mr. [Steve] Walker Assistant Bureau Chief on April 11th, 1996, you specifically asked Ray Bass to be allowed to fill that position through the competitive selection process called for provisional appointments, didn't you?

"MR. ARKLE: Yes, sir.

"[PLAINTIFFS' COUNSEL]: And he said "no," didn't he?

"MR. ARKLE: Yes, sir.

"[PLAINTIFFS' COUNSEL]: Thereby, you're saying forcing you to put him out of class, correct?

"MR. ARKLE: Yes, sir. But as I testified, I don't know the reason why we couldn't at that time do a provisional appointment." [28]

In light of the court's order of September 18, 1995,[29] adopting the Transportation Department's suggestion that all interim vacancies in the SPD project classes were to be filled through the open and competitive provisional appointment process, the court is equally unaware why such requests were denied.

■ *Article XI:* The plaintiffs also contend that the placement of employees in out-of-class assignments, rather than filling them through provisional appointments or rotating the temporary assignment, is a violation of article XI, ¶ 11. Paragraph 11 states:

"The Highway Department will take affirmative steps to have eligible black employees of the Department receive assignments at rates proportional to their representation in the relevant job classifications to the better in-house job titles at the Highway Department. In the event that the plaintiffs conclude that the efforts of the Highway Department in this area are not adequate, they may petition the Court for further relief in this area during the pendency of this Decree."

At trial in 1992, the plaintiffs presented statistical evidence to support their position that class members were being excluded from the higher ranks in the Alabama Department of Transportation despite the *Frazer* injunctions entered in 1976, some 16 years earlier. For example, in the Civil Engineering ranks, black employees made up less than one-half of 1% (or 3 of 591) of all Civil Engineers. There were no blacks among the two Civil Engineer–VIIs, 19 Civil Engineer–VIs, 16 Civil Engineer–Vs, 89 Civil Engineer–IVs, or 119 Civil Engineer–IIIs. There was one black Civil Engineer–II of 131, and two blacks among 215 Civil Engineer–Is.[30] Article XI, ¶ 11, among others, was included to remedy the exclusion of blacks from upper level and supervisory positions. The plain-

**28.** *Id.* at 243–44.

**29.** Doc. no. 753.

**30.** *See* transcript of third day of hearing on plaintiffs' motion for permanent injunction, held March 26, 1997, at 632–33.

tiffs contend that the defendants' failure to comply with this provision has perpetuated the discriminatory effects of constitutional violations and extended the opportunities for supervisors to hand select employees for promotion. The grievance process, as advocated, will allow those same supervisors to resolve grievances by granting promotions, and thus avoiding application of article XI's requirement of granting equal on-the-job opportunities to black employees. Special masters in the Hudson Hinton and David Lee Sims grievances found a failure even to attempt to comply with this provision.[31]

The defendants offer no argument in reply. In fact, in the joint omnibus report filed with the court on September 30, 1996, the defendants did not even respond to the plaintiffs contention that there had been no efforts to comply with article XI, ¶ 11.[32]

*Article XV:* On June 16, 1997, the court entered an order finding that the appropriate date of analysis for the reclassification project under article XV was the time of entry of consent decree I—early 1994.[33] That finding, and its explanation, laid to rest many of the reclassification issues raised at the hearings on these motions. However, the court did not directly address the defendants' argument that the implementation of article XV, in the 'permanent' manner advocated by the defendants, be used to resolve grievances of the sort challenged here. Obviously, this argument now only applies to those employees who were working out of classification at the time of the decree, not those who have acquired positions since, a result which may alter the defendants' position on reclassification as a remedy.

Compliance with this article in its entirety has been referred to a United States Magistrate Judge, and his recommendation is due by no later than April 10, 1998.[34] Thus, the interpretation of these provisions awaits his recommendation. In the interim, the court

observes that the resolution of the proper date for reclassification does not remove the two concerns raised by the plaintiffs: first, that implementation of the reclassification as proposed by the intervenors and defendants would circumvent many of the same provisions of the consent decree as would the use of the grievance procedure; and, second, that the reclassification would perpetuate past discrimination, in violation of the *Frazer* orders and consent decree I, article XIX. For those reasons, the court finds that the defendants' alternative proposal of awarding these grievants, and others similarly situated, permanent promotions through reclassifications rather than grievance settlements, simply does not address the essence of the conflict between the granting of promotions based on out-of-classification assignments and the cited provisions of the consent decree.

The defendants again respond that they have complied with article XV, ¶ 4's 90% requirement to the degree "practicable." On that subject, as with article XIV, testimony supported the position there was only a self-imposed impediment to opening a competitive provisional appointment process for these vacancies, which were then filled with out-of-classification personnel. Newal Cauthen, Division Engineer for the Fourth Division stated:

"[PLAINTIFFS' COUNSEL]: And when you were asked the question about it not being practicable to keep people in their proper classification ninety percent of the time and thereby comply with article 15, paragraph 4, did you answer that question in the context of the denial of your request for provisional appointments?

"MR. CAUTHEN: I don't know if I understand your question.

"[PLAINTIFFS' COUNSEL]: If they were to stop denying your request for provisional appointments in the Central Office, would you be able to keep employ-

---

**31.** Recommendation of the special master, entered August 22, 1996 (Doc. no. 1200), at 18, and recommendation of the special master, entered December 10, 1996 (Doc. no. 1427), at 4.

**32.** *See* joint omnibus report, filed September 30, 1996 (Doc. no. 1251), at 98.

**33.** Doc. no.1931. A memorandum opinion in support of the order followed on June 19, 1997 (Doc. no.1941).

**34.** *See* order, entered February 27, 1998 (Doc. no. 2464).

ees ninety percent of the time in their proper classification?

"MR. CAUTHEN: That is correct.

"[PLAINTIFFS' COUNSEL]: You would, correct?

"MR. CAUTHEN: Correct." [35]

■ *Article XVI:* In furtherance of the polestar goal—creating a fair and competitive environment—the parties included in consent decree I an article which focused on training. Included in article XVI are programs and policies designed to remedy the denial of training opportunities to class members in the past. In particular, ¶ 1 has a subsection which provides for a program "with the goal of assisting such employees in progressing in career paths." Referring to the training provisions, the court has said:

> "[T]his goal is to be met through *substantive* and *aggressive* training of individual African–American employees in *knowledge, skills and abilities* needed because the department discriminatorily kept them in lower and less desirable classifications and lines of progression and because, as a result, they now lack necessary on-the-job training and experience." [36]

The court has stated that it finds article XVI obligations are "at the heart of consent decree I." [37] Numerous orders, injunctions and warnings regarding compliance with this article have been entered by the court,[38] the compliance of which is now before the court

on the recommendation of a United States Magistrate Judge for enforcement.[39]

The plaintiffs contend that the provisional installation of grievants into promotions intensifies the effects of the defendants' failure to comply with their training obligations. That is, in the absence of training, the award of out-of-classification assignments based on knowledge, skills, and abilities acquired by training given to select employees, but denied to others, perpetuates past discriminatory practices. To then award promotions on that basis reinstalls the earlier practice of tutelage of favored employees, rather than an equal opportunity to develop skills valuable in a competitive system. By permitting the installation of favored employees into these opportunities, the critical purposes of article XVI are thwarted.

## C.

■ The defendants and the Adams intervenors further contend that the court's rulings in the grievances of Hudson Hinton and David Lee Sims, two plaintiff class members, compel the conclusion that, under article XV, ¶ 4, employees working out of class more than 10% of the time are entitled to the provisional appointments under the grievance procedure. The defendants' and the Adams intervenors' reliance on these two grievances is misplaced.[40]

**35.** Transcript of first day of supplemental hearing on plaintiffs' motion for permanent injunction, held April 22, 1997, at 129.

**36.** Order, entered January 21, 1997 (Doc. no. 1491).

**37.** *Id.* at 17.

**38.** *See id.* for a detailed discussion of history of article XVI compliance.

**39.** Recommendation of the magistrate judge, entered October 1, 1997 (Doc. no. 2140), and supplemental recommendation of the magistrate judge, entered October 27, 1997 (Doc. no. 2204).

**40.** Paragraph 7 of article XIX of consent decree I provides:

> "Complaint procedure: Within 180 days of the effective date of this Decree, the Highway Department will develop and implement an enhanced complaint procedure which assures

> that all discrimination complaints are processed without fear and reprisal within established time limits and that appropriate action is taken following decisions. Such procedure will be submitted to plaintiffs' counsel for review and comment at least 30 days prior to its implementation."

Pursuant to this provision, the parties adopted, without court approval, a grievance procedure that allowed a dissatisfied grievant to pursue relief directly before this court. Upon learning of the procedure, the court informed that parties that it was not a 'super personnel board,' and that the parties would have to revise the procedure to remove the court from the process, and that a dissatisfied grievant would simply have to file a new and separate lawsuit if he wanted court review of his grievance. The grievance procedure was so amended. *See* order entered August 9, 1995 (Doc. no. 707) (adopting revised grievance procedure, filed August 9, 1995 (Doc. no. 706)). The Hinton and Sims grievance were heard under the old procedure, and thus their claims were ultimately presented to the court for

*Hinton Grievance:* In a recommendation filed August 22, 1996, a special master appointed by the court found Hudson Hinton to be deserving of a provisional appointment.[41] The court adopted that recommendation, along with her findings of fact, on October 18, 1996.[42] The special master entered findings of violations of numerous provisions of the consent decree, including all of those implicated in this matter. She did, as the defendants contend, find a violation of article XV, ¶ 4. However, the basis of her recommendations was a finding of racial discrimination, in violation of article IX. She stated:

> "The Special Master is further convinced that the provisional appointment process was used to avoid giving black employees, such as Hudson Hinton, a fair opportunity to advance in the department and to reward white employees and provide them with greater job opportunities, in violation of article IX, ¶ 6 of the decree, which explicitly prohibits the use of provisional appointments to 'avoid black eligibles or the other provisions of the th[e] Decree.' As a result of these violations, Hinton was prevented from receiving an appointment to CE II, a position for which he was qualified and for which he had been recommended." [43]

Grievant McCullough was one of the white employee comparators who received a provisional appointment at the time Hinton's was denied. Thus, the defendants are wrong when they state that Hinton was not granted his promotion "due to his performance of the duties of that higher classification, although Hinton had never been ranked, scored, or placed on a [Civil Engineer-]II register." [44] This was not the special master's reasoning. Moreover, the defendants' and the Adams intervenors' suggestion that McCullough should now be granted a promotion based on a finding that the department discriminated in favor of him can only be characterized by the timed-honored word, "chutzpah."

Finally, the special master's recommendation expressed concern that the delay in compliance with provisions related to assignments of duties, rotation of duties, and training, has created tension between the use of reclassification and those portions of the de-

review. The court appointed special masters to hear the grievances filed by Hinton, Sims, and others under the old procedure. *See* order entered July 5, 1995 (Doc. no. 666).

**41.** *See* recommendation of the special master, entered August 22, 1996 (Doc. no. 1200).

**42.** *See* order and injunction, entered October 18, 1996 (Doc. no. 1299). The special master recommended that Hinton be 'reclassified,' but the court ordered that he be 'provisionally appointed.' Contrary to the defendants' representation that the 'court' made such a determination, the adjustment was made by the agreement of the parties that the use of the term 'reclassification' was in error. The discussion began with an observation that any relief granted Hinton should be provisional, not permanent, since that was what he was denied, and proceeded to agreement that 'provisional appointment' was the proper term.

> "[ADAMS INTERVENORS' COUNSEL]: ... [T]he reason for my comment on that is the complaint here was that he did not get a provisional reclassification like everyone else was getting, so it would be my suggestion that any order of reclassification be to a provisional reclassification, which is all he was denied by the Department under his grievance.
> "THE COURT: Okay. Let's take that up, Mr. Wiggins, that the appropriate relief, if any,

> should be a provisional reclassification. What's your response?
> "[PLAINTIFFS' COUNSEL]: Well, I'm in agreement, with one nuance, and that is what the special master found was that he was not provisionally appointed in April of 1994. ... So, it's not a reclassification issue, it's a provisional appointment issue.

> . . . . .

> "[DEFENDANTS' COUNSEL]: I agree with Bob about that, Judge. If that recommendation was accepted, the appropriate thing would be a provisional appointment.
> "THE COURT: Provisional appointment. Okay."

Transcript of telephone conference, October 11, 1996, at 5–6.

**43.** Recommendation of the special master, entered August 22, 1996 (Doc. no. 1200), at 34.

**44.** Defendants' brief in opposition to plaintiffs' motion for permanent injunction concerning the revised grievance procedure, filed June 9, 1997 (Doc. no.1921), at 7. Hinton applied for the CE–II register in February 1993. The state personnel board found him to be eligible for the CE–II exam, but it was never given. Therefore, though qualified to take the exam, he was never given a rank or score, or placed on the CE–II register. *See* recommendation of the special master, entered August 22, 1996 (Doc. no. 1200), at 6.

cree. Therefore, though she reluctantly recommended that Hinton be placed in an out-of-classification position, she stated:

"However, the Special Master does not believe that upon reinstatement, Hinton should automatically be reclassified to a CE III simply because he will be performing duties out of his classification. Such a result would undercut other provisions of the decree, which have sought to limit the use of out-of-classification assignments and the reclassification process as a means of circumventing the normal promotional procedures of the merit system."[45]

In other words, the recommendation specifically condemns the process which the defendants and the Adams intervenors now claim it requires. The recommendation, submitted in August 1996, portends the court's similar observation that the grievance procedure, when used to award promotions on the grounds of out-of-classification assignments, "is on a collision course with the consent decree."[46] The Hinton grievance cannot logically create the right that the defendants and the Adams intervenors claim it extends to employees working in out-of-classification jobs.

*Sims Grievance:* On May 28, 1996,[47] and December 10, 1996,[48] a special master entered reports that, together and in part, recommended to the court that the grievance of David Lee Sims be upheld. On June 26, 1996,[49] and February 4, 1997,[50] the court entered orders agreeing with the reports of the special master with regard to Sims. The court agrees with defendants, as well as with the Adams intervenors, that these recommendations and orders have created much confusion—in particular, with regard to the legal basis on which the Sims grievance was upheld. For this reason, the court will review the Sims grievance in some detail.

In his report entered on May 28, 1996, the special master wrote that, "The grievant, David Lee Sims, is employed by the Alabama Department of Transportation, 4th Division, as a HMT I[, that is, a Highway Maintenance Technician I]. Mr. Sims was employed as a laborer from January 1984 to July 1985, at which time he was promoted to his present position of HMT I. On August 26, 1992, Mr. Sims filed an application for the position HMT II. Although a vacancy was created several months before the hearing by the retirement of Mr. Eddie Bailey, who had been the only black HMT II in the 4th Division, it does not appear that anyone has been selected for that position. The only explanation given for not hiring or promoting people in the various HMT classifications was that a freeze had been placed on such personnel actions."[51] The special master then concluded that "it is recommended that the Court determine the validity of any such freeze, and, if the Court finds that the freeze does not validly exist, it is recommended that David Lee Sims be promoted to HMT II with retroactive backpay to August 26, 1992, or as of such later date as any such freeze was or may be removed."[52] The special master then entered a formal recommendation that "Subject to the court's finding with regard to the existence and legitimacy of a promotion freeze, the Special Master recommends that Mr. Sims be promoted to HMT II, possibly to the position vacated by the retirement of Eddie Bailey."[53]

By order entered on June 26, 1996, the court adopted the recommendation of the special master stating as follows: "The Special Master recommended that Sims be promoted to Highway Maintenance Technician

---

**45.** Recommendation of the special master, entered August 22, 1996 (Doc. no. 1200), at 37.

**46.** Order and injunction, entered February 27, 1997 (Doc. no. 1587).

**47.** Recommendation of the special master, entered May 28, 1996 (Doc. no. 1037).

**48.** Recommendation of the special master, entered December 10, 1996 (Doc. no. 1427).

**49.** Order and injunction, entered June 26, 1996 (Doc. no. 1091).

**50.** Order and injunction, entered February 4, 1997 (Doc. no. 1512).

**51.** Recommendation of the special master, entered May 28, 1996 (Doc. no. 1037), at 2.

**52.** *Id.*

**53.** *Id.* at 10.

II subject to a further finding regarding the nature and validity of the hiring freeze. By agreement of the parties, this issue is remanded to the Special Master for initial consideration of the validity and nature of the hiring freeze, not only as to the 4th Division but system-wide, and the significance of the hiring freeze as to the grievance of Sims. The court reserves ruling at this time on the recommendation that Sims receive a promotion. The Special Master shall file a report containing his conclusions by August 1, 1996." [54] *It is important to emphasize at this point that neither the defendants nor the Adams intervenors took issue with the special master's finding of liability other than as to the issue of the significance of the hiring freeze defense. As a result, because there was otherwise no objection, the court did not independently review the issue of liability except as to the issue of the hiring freeze defense.*

In a recommendation entered on December 10, 1996, the special master defined the issue as "the validity and nature of the system-wide hiring freeze, and the significance of the hiring freeze to the grievance of Sims." [55] The special master found that the " 'appointments freeze' ... has the effect of making enforcement and monitoring of the decree substantially and unnecessarily more onerous." [56] The special master recommended to the court "that David Lee Sims be promoted to Highway Maintenance Technician II, and that Mr. Sims be paid full backpay effective as of January 20, 1994, which is the date Mr. Sims completed the SPD form 40, later approved by his supervisor, confirming that Sims was out of classification ... the question of the effective date cannot be answered with mathematical precision, and it is found that January 20, 1994, would be reasonable and equitable under all circumstances." [57]

By order entered on February 4, 1997, the court upheld the special master's recommendation.[58] First, the court rejected the defendants' and the Adams intervenors' contention that, "unless Sims demonstrates that the freeze was discriminatory, he cannot be entitled to any relief in the form of promotion and accompanying backpay." [59] The court stated that "Sims's complaint was not that the hiring freeze was discriminatory, but that the Department of Transportation worked him in an out-of-classification position, and then failed to promote him to the position he *de facto* held, in violation of the existing decrees in effect. To the extent that plaintiffs maintain Sims could legally be denied a promotion which he was otherwise due *only* by the proper implementation of a valid hiring freeze, the court finds that they are correct. Furthermore, the Special Master's first recommendation submits that Sims is entitled to promotion, unless the hiring freeze 'validly exist[s].' Obviously, had there been insufficient evidence to support a finding of a violation, there would be no need to assess a defense, and a waste of time to remand for further hearings. It is clear that the issue before the Special Master and now before the court is defendants' affirmative defense of a hiring freeze valid under the consent decree and other applicable law." [60]

The court went on to write that, "Having defined the question, the court must now determine whether the hiring freeze was, indeed, imposed and conducted in a manner congruent to defendants' obligations to the plaintiff class. To this end, the court engaged in a syllogistic analysis:

"First, article XV, ¶ 4 states: 'Duties within the job description: The Highway Department will monitor the duties and responsibilities performed by employees with the goal of assuring to the extent practicable that at least 90% of the duties and responsibilities performed by employees on

**54.** Order and injunction, entered June 26, 1996 (Doc. no. 1091), at 1.

**55.** Recommendation of the special master, entered December 10, 1996 (Doc. no. 1427), at 1.

**56.** *Id.* at 15–16.

**57.** *Id.* at 17.

**58.** Order and injunction, entered February 4, 1997 (Doc. no. 1512).

**59.** *Id.* at 3.

**60.** *Id.*

a regular or non-emergency basis are within .the job description for job they are holding.'

"Second, Sims was regularly assigned the duties of an HMT II though he held the job title of HMT I. He proved that by January 20, 1994, he was working out of classification at least 87% of the time. Furthermore, the Department of Transportation makes no contention that Sims is not qualified to serve as an HMT II.

"Third, to comply with Article XV, 4, the Department of Transportation was obligated either to work Sims within the HMT I classification he held, or to provisionally appoint him to the HMT II classification in which he was performing nearly 90% of his duties, so long as it was 'practicable.' Because the Department of Transportation did not choose the former, it was obligated to comply with the latter. The department claims, however, that, because of the hiring freeze, it was not 'practicable' to comply with . article XV, ¶ 4 by promoting Sims.

"Fourth, the evidence reflects that the hiring freeze was not a practicable impediment, because there were at least two methods which might have permitted Sims's provisional appointment. During the prior hiring freezes in effect in 1993, 1994 and 1995, the Department of Transportation was granted *blanket* exceptions and made provisional appointments. In addition, there was an option to request *individual* exceptions to this freeze, according to the testimony of Governor James. However, in spite of prior successful use of these exceptions, the Transportation Department did not pursue them on behalf of Sims. The hiring freeze was not a 'practicable' impediment to t[h]e department's compliance with ¶ 4." [61]

The court concluded that "the Alabama Department of Transportation should have, and could have, 'practicably' complied with ¶ 4 through the use of a provisional appointment of Sims to HMT II, but did not do so, in violation of the consent decree." [62]

The court observed that "Defendants and the Adams intervenors object to the recommendation that Sims receive a classification of HMT II, noting that he is on the list of article XV reclassifications that are the subject of motions pending before the court. They argue that permitting his reclassification, while requiring other employees to wait for the court to resolve the article XV issue, is unfair. They point out that other employees—many of them white—have worked out of classification without promotion, which they say demonstrates that there was no discriminatory intent in failing to promote Sims." [63] The court responded, in part, that "This argument has no bearing on the Sims recommendations for two reasons. First, Sims has no obligation to show that the department acted in a discriminatory manner, but only that they failed to conform to the decree. Second, the Special Master used the Form 40 completion date as a reliable point when Sims was clearly working out of classification a vast percentage of the time, but the use of that date does not implicate the article reclassification project. In point of fact, the Special Master's recommendation states that 'the question of this effective date cannot be answered with mathematical precision, and it is found that January 20, 1994, would be reasonable and equitable under the circumstances.' " [64]

The Adams intervenors argue that "The Court's syllogistic argument and analysis in Sims should apply with equal force to all grievances which allege that the department has worked an employee out of classification in violation of Article XV, paragraph 4." "The court presented the [Transportation Department]," according to the Adams intervenors, "with only two choices in Sims: either it had to have worked Sims within his classification or it was obligated to provisionally appointment him to the classification of the job duties he was assigned to perform. The department should not have a different set of options when the out-of-classification

**61.** *Id.* at 5–7.

**62.** *Id.* at 7.

**63.** *Id.* at 7–8.

**64.** *Id.* at 8.

employee happens to be non-black." [65] However, the Adams intervenors miss an extremely important point. It was in the first recommendation and order, and in that recommendation and order only, that it was determined that Sims was entitled to relief, depending on the validity of the hiring freeze. The second recommendation and order address only the issue of the hiring freeze defense. The syllogism given by the court, therefore, would only speak to the department's *defense of the hiring freeze.* The syllogism used by the court would apply equally to the grievances filed by Grant, D'Arville, and McCullough only if they could initially establish that they were otherwise— that is, for reasons other than ¶ 4 of article XV—entitled to relief. In other words, the Adams intervenors skip a critical step in the argument. They would first have to show, as the special master found in his first recommendation, that Grant, D'Arville, and McCullough were entitled to relief and that the department was liable to them, subject to the issue of the validity of an articulated hiring freeze defense. Only then would the question of the validity of a defense come into play, and only then would the syllogism mentioned, and relied upon by the Adams intervenors, be at issue.

Moreover, the court has not, as charged by the Adams intervenors, established "a different set of options when the out-of-classification employee happens to non-black." [66] The Adams intervenors state that "The court explicitly held that Mr. Sims did not have to prove racial discrimination but need *only* show that he was worked out-of-classification in violation of article XV, paragraph 4," [67] and "the court granted Sims a provisional appointment based *solely* on the finding that his out-of-classification assignment violated Articles XV, paragraph 4's provisions that employees should, to the extent practicable, be worked 90% of the time within their classification." The Adams intervenors charge that "non-black employees of [the Transportation Department] are clearly entitled to

have the race-neutral language of Consent Decree I applied to them in the same manner as it has been applied to Mr. Sims." [68] The intervenors mischaracterize the court's holding on the Sims grievance. The syllogism set forth by the court did not, by itself, entitle Sims or anyone else, black or non-black, to relief under ¶ 4 of article XV. Instead, a grievant would first have to show that he or she was entitled to a provisional appointment, subject only to the validity of the Transportation Department's hiring freeze defense. The syllogism was directed only to the department's defense of the hiring freeze.

The Adams intervenors further observe that, "In the Sims grievance, [the Transportation Department] and the Adams Intervenors argue[d] that it was unfair to award Sims reclassification in his grievance when other employees were required to wait for the Court to decide the article XV Reclassification issue." Again, the Adams intervenors' argument takes the issue completely out of context. To be sure, the court stated that "This argument has no bearing on the Sims recommendation for two reasons. First, Sims has no obligation to show that the department acted in a discriminatory manner, but only that they failed to conformed to the decree. Second, the Special Master used the Form 40 completion date as a reliable point when Sims was clearly working out of classification a vast percentage of the time, but the use of that date does not implicate the article XV reclassification project." But this statement was made only in the context of, and addressed only, the Transportation Department's defense of the hiring freeze. With regard to the hiring freeze, "Sims has no obligation to show the department acted in a discriminatory manner." With regard to only the issue of when Sims's relief should begin, did the court state that "the special master used the Form 40 completion date as a reliable point when Sims was working out of classification a vast percentage of the

---

65. Adams intervenors' brief in opposition to plaintiffs' motion for temporary restraining order and/or preliminary injunction, filed April 8, 1997 (Doc. no. 1755), at 10.

66. *Id.*

67. *Id.*

68. *Id.* at 11.

time." The special master used the Form 40 completion date only because "The question of this effective date cannot be answered with mathematical precision," and the special master regard the January 20, 1994, date "would be reasonable and equitable under the circumstances." [69] The special master made it clear that he was invoking the January 20, 1994, date only as a reference date because it was difficult to establish another point in time.[70]

The following statement by the Adams intervenors is, therefore, incorrect: "When Sims was awarded a provisional appointment under the grievance process, the Court found that Sims's entitlement to reclassification under Article XV had 'no bearing' on whether he should be allowed to receive a provisional appointment in his grievance. The result should be no different when non-blacks seek provisional appointments by filing grievances." [71] Sims's proposed reclassification has "no bearing" because the relief granted was not granted purely on the basis of his work out-of-class, but on the special master's finding and recommendation that Sims was entitled to the provisional appointment, unless the hiring freeze actually prohibited it. The reference went to the issue of how the special master had used the January 1994 date as a reference point, rather than basing his recommendation on the out-of-class assignment.

It is also important to explain that the Adams intervenors did *not* object to the special master's initial recommendation that Sims was entitled to relief, subject only to the validity of the hiring freeze. Moreover, the Transportation Department agreed with the special master's initial recommendation that the only dispute for the court was the department's defense of the hiring freeze. The court therefore did not, and did not have to, reach the issue of the special master's finding that was preliminary to the department's defense—that is, that Sims was otherwise entitled to relief. The Adams intervenors' delayed efforts to infer from the court's comments regarding the hiring freeze the meaning that all employees, black or non-black, should now be entitled to relief merely because the court rejected the Transportation Department's hiring freeze defense, is unsupportable. If the Transportation Department and the Adams intervenors took issue with the preliminary findings of the special master, they should have objected to that aspect of the special master's initial recommendation as well.

The Adams intervenors and the Transportation Department cannot use this unobjected-to aspect of the special master's recommendation to bind the court into using the grievance procedure and article XV, ¶ 4, as a closed and noncompetitive means of promotion in direct conflict with the other provisions in consent decree I which attempt to open the process and make it fair and competitive. *If* this had been the premise of the special master's initial recommendation, and *if* an objection had been made to it, the objection would have been sustained. That such was not a premise upon which the special master was proceeding is made clear in his second recommendation, wherein he stated: "[I]t is more likely that fairness will be achieved if openness is required. It is in this context that the remand of this grievance must be considered." [72] But they did not object, and the Adams intervenors and the Transportation Department cannot bootstrap their acquiescence into a court-approved reintroduction of condemned processes of non-competitive, secretive, handpicking of employees for promotion.

**69.** Recommendation of the special master, entered December 10, 1996 (Doc. no. 1427).

**70.** The plaintiffs point out that although Sims did not most recently apply for a CE position until August 1994, article I imposes a duty to recruit those employees who had applied within the past 10 years for engineering positions. Thus, the special master's choice of a date earlier than Sims's application was not illogical, given that his application was still active at that time.

**71.** Adams intervenors' brief in opposition to plaintiffs' motion for temporary restraining order and/or preliminary injunction, filed April 8, 1997 (Doc. no. 1755), at 13.

**72.** Recommendation of the special master, entered December 10, 1996 (Doc. no. 1427), at 5.

In any event, even if the court's determination of Sims's grievance could be read in the manner the Adams intervenors would have it, this reading would not justify the catastrophic result that would flow from allowing the grievance procedure to be used as the Adams intervenors want. The disputed reading of a single paragraph cannot be permitted to turn the entire consent decree on its ear, and undo the effects of nearly three decades of litigation. As stated, such a result would conflict with those provisions in the consent decree, article I (recruitment), article IV (provisional appointment), article XI (proportional assignments), article XIV (rotation of job duties), article XV (reclassification), and article XVI (training), which together provide for an open and competitive system in which all persons, regardless of race, may pursue and be considered for promotions, both provisional and permanent, on the basis of merit. An error on the court's part could never justify the jettison of all these other provisions agreed to by the parties, and which comprise a central theme of the consent decree.

Admittedly, the third part of the syllogism—that "the department was obligated either to work Sims within the HMT classification he held, or to provisionally appoint him to the HMT II position in which he was performing nearly 90% of his duties so long as it was 'practicable"'—could be read to mean that this alone would have justified Sims's grievance as well as the grievances filed by Grant, D'Arville, and McCollough. Although the special master failed in his original recommendation to identify what provision of the consent decree I the Transportation Department had failed to meet, it is reasonable to presume, in the absence of a specific finding, that the special master made the findings necessary to support his conclusion that Sims was entitled to a promotion, especially in light of the evidence in the record of the first hearing that qualified and entitled black employees had not been promoted to HMT–II in Sims's district.

In any event, to the extent the syllogism has led to the impression that merely these circumstances would justify relief for Sims and for any of the other persons—potentially hundreds—in the Transportation Department, the syllogism was incorrect and improvidently stated. The court therefore withdraws it. As the Eleventh Circuit Court of Appeals has noted, "no one is perfect, least of all federal appellate judges, and from our mistakes and oversights spring inconsistent decisions which we must deal with as best we can." *United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993). To be sure, this observation applies equally to district judges. Therefore, an incorrect decision or improvident language cannot justify the result that would flow if the grievances were allowed to proceed as the Adams intervenors want.

Finally, it is not without significance that the relief Hinton and Sims received through the Transportation Department's grievance procedure was the end-product of very extensive and hotly-contested proceedings before two court-appointed special masters followed by further extensive proceedings before the court itself. The merits of Hinton's and Sims's claims were fully tested. The settlement agreements that Grant, McCullough, and D'Arville entered into were not subjected to such independent and detailed scrutiny, nor will the hundreds of other settlement agreements that the Adams intervenors ask the court to allow be similarly tested. Common sense therefore dictates that the court in no way countenance what amounts to, for reasons already given, not only awful personnel policy but a circumvention of independent review and scrutiny. Abuse in the circumstances presented by these settlements is not simply possible, it is probable. And, in light of the preliminary evidence presented of an extended and pervasive history of racial discrimination in the Transportation Department, this abuse will almost certainly manifest itself in racially discriminatory practices.

### D.

At first blush, it would appear that, without question, the plaintiffs are entitled to a permanent injunction. The plaintiffs have established, first, that to allow Grant, McCullough, D'Arville, and hundreds of others to obtain promotions through private settlement agreements with their supervisors

would violate, in ways almost too numerous to list, both consent decree I and the earlier injunctions in *Frazer*. The plaintiffs have further shown that they would suffer irreparable harm. The Transportation Department informs the court that it has hundreds of grievances currently making their way through the grievance procedure based on the same or similar grounds as those before the court, and, of course, has recommended hundreds of employees for permanent reclassification based on their performance of out-of-classification duties. Those facts make clear that permitting these appointments to go forward would unleash chaos within the Transportation Department, resulting in a stampede into positions which could render any possible system-wide remedy, based on open competition, moot, as well as impossible to implement. On the other hand, should the positions be opened for competitive selection, all qualified employees, including the grievants, would have the opportunity to compete for these appointments and to be selected if determined to be best qualified. The loss of even an opportunity to compete on a non-discriminatory basis is an injury by itself. *See General Contractors v. Jacksonville*, 508 U.S. 656, 666, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993) (the 'injury in fact' in an equal protection case is loss of even an opportunity to compete for a benefit on a non-discriminatory basis, not just the inability to obtain the benefit).

Additionally, the plaintiffs have demonstrated through witnesses and documents that there are class members qualified and willing to assume the duties and positions which are currently being filled out-of-class, often by employees not eligible to compete for the position for lack of qualifications. One such witness was Rozlyn Cook, hired in 1993 as the first ever black Civil Engineer–IV in the history of the Transportation Department, a job which does not require a college degree.[73] Cook has a B.S. in civil engineering from the University of Alabama, a master's in business administration from Auburn University in Montgomery, a master's in civil engineering from Auburn, is working toward a Ph. D. in civil engineering while working full-time for the Transportation Department, and has significant work experience as an engineer. Cook testified that she was qualified and would have applied for at least seven specific positions, had they been announced and posted and filled on a competitive basis. Instead, those positions are occupied by employees who are performing the duties out-of-class. It is impossible to imagine that anyone with an objective eye would fail to recognize the benefits to the department which could be gained by allowing such class members to compete for positions. Equally compelling are these class members' personal characteristics of motivation and tenacity as they have waited for years in a system that *still* will not let them on certain playing fields. Should the out-of-class positions be filled pursuant to these private, noncompetitive agreements, not only will those opportunities for promotion, even on a provisional basis, be lost, but also those opportunities for early development of skills and abilities will be lost, a benefit which cannot be regained.

Moreover, it cannot be overlooked that the issue of out-of-classification assignments and reclassifications has become vastly complicated by the Transportation Department's and Personnel Department's delays in implementing consent decree I. Time and time again the defendants have failed to meet the obligations and the deadlines to which they agreed.

The unexplained delays in compliance, or even steps toward compliance, with the article IV personnel projects—including the reclassification project—was not brought to the attention of the court until virtually the deadline of its completion date, the spring of 1996, two years after entry of the consent decree. Upon request by the Adams intervenors, joined by the Transportation Department, for imposition of a monitor to speed compliance with articles II, III, IV, and XV, the court stated:

March 26, 1997, at 615–33.

---

**73.** *See* transcript of third day of hearing on plaintiffs' motion for permanent injunction, held

"THE COURT: ... I honestly have to admit that I had the impression that come April or March or whatever, there would be full compliance with the articles at issue. And suddenly I find out that not only will those deadlines, or that deadline not be met, but we're talking about an extensive period of time before any such deadline can be met." [74]

The court will not recount the entire history of delays in implementing these articles in this already lengthy opinion, but must note that the unreasonable delays in the personnel projects have contributed substantially to the current state of out-of-classification issues, and continue to complicate this already very complex litigation well into the future. As the Transportation Department counsel stated in the same conversation quoted above, held nearly two years ago,

> "[DEFENDANTS' COUNSEL]: ... [I]f Personnel does not move quickly to follow through on its commitments, and to complete the reclassification and the validation, then everybody loses." [75]

The court cannot understand the defendants' delays in implementing a fair and competitive system. All parties agree that it is to everyone's benefit to have an open and competitive system in place. Every Alabama Department of Transportation manager who testified in this hearing before the court agreed that the preferred method for finding those who are best qualified is an open and competitive process. And, the following testimony reflects, in an open and competitive process, resentment is less likely to fester, so that morale and cooperation are better:

> "[PLAINTIFFS' COUNSEL]: As between the out-of-classification process and the provisional appointment process, the better management practice is to use the competitive provisional process, isn't it?
>
> "MR. ARKLE: I agree with that.

"[PLAINTIFFS' COUNSEL]: It is a better management practice to post and allow people to compete, isn't it?

"MR. ARKLE: Yes, sir.

"[PLAINTIFFS' COUNSEL]: It improves employee morale, doesn't it?

"MR. ARKLE: Yes, sir.

"[PLAINTIFFS' COUNSEL]: It allows you to get a pool of qualified people from which you can get the best qualified person from, correct?

"MR. ARKLE: Hopefully.

> . . . . .

"[PLAINTIFFS' COUNSEL]: But the only way you're going to be able to assemble the widest and best group of applicants is to announce the opportunity and give people a chance to put their hat in the ring, correct?

"MR. ARKLE: I think that would be the preferred way of doing it." [76]

The grievants, Grant, McCullough, and D'Arville, themselves testified that they would prefer to compete for the positions they hold.

> "[PLAINTIFFS' COUNSEL]: You don't really want to get positions that you don't deserve, do you?
>
> "MR. MCCULLOUGH: No, sir.
>
> "[PLAINTIFFS' COUNSEL]: You believe in competition and winning things by merit, fair and square, don't you?
>
> "MR. MCCULLOUGH: I have no problem with that, sir.
>
> "[PLAINTIFFS' COUNSEL]: And you're proud of your qualifications, correct?
>
> "MR. MCCULLOUGH: Yes, sir.
>
> "[PLAINTIFFS' COUNSEL]: You're willing to put them up and have them judged competitively with other people that would want to be considered?
>
> "MR. MCCULLOUGH: I have no problem with that, sir." [77]

---

**74.** Transcript of telephone conference, held February 2, 1996, at 11.

**75.** *Id.* at 24.

**76.** Transcript of first day of hearing on plaintiffs' motion for permanent injunction, held March 24, 1997, at 108–09.

**77.** Transcript of fourth day of hearing on plaintiffs' motion for permanent injunction, held March 27, 1997, at 741–42.

**1154**

Yet, the defendants have filed with the court motions delaying the completion of article III validation projects until well into 1999 and beyond, further delaying the establishment of a system of hiring and promotion.[78] The goal of this litigation should be, and is, the creation and maintenance of a level playing field on which all can compete according to fair and equally enforced rules. Absent extenuating or exceptional circumstances, an employee should have to compete in an open and competitive process for responsibilities and opportunities. In *Ensley Branch N.A.A.C.P. v. Seibels,* 31 F.3d 1548, 1571 (11th Cir.1994), the Eleventh Circuit Court of Appeals stated that "An end to racial discrimination demands the development of valid, non-discriminatory selection procedures." Consent decree I attempts to achieve this end result. The grievance procedures which the Adams intervenors would now impose on this process, and the wholesale permanent reclassifications the defendants propose as an alternative, would essentially reintroduce the covert and noncompetitive selection process, which existed prior to the entry of consent decree I and which served as a feeding ground for the serious and substantial charges of widespread race discrimination in the department. "Public employers cannot escape their constitutional responsibilities merely by adopting facially-neutral policies that institutionalize the effects of prior discrimination and thus perpetuate de facto discrimination. *See United States v. Fordice,* 505 U.S. 717, 728, 112 S.Ct. 2727, 2735–36, 120 L.Ed.2d 575 (school desegregation case)." *Ensley Branch,* 31 F.3d at 1575.

Nevertheless, against this compelling background, the court must still hesitate in granting the permanent injunctive relief requested by the plaintiffs. In *Newman v. Alabama,* 683 F.2d 1312, 1318 (1982), the Eleventh Circuit Court of Appeals made clear that the proper method of enforcing a consent decree is not a 'motion to enforce' or similar plea for the court to 'do something,' but rather that a plaintiff seeking to obtain the defendant's compliance with the provisions of an injunctive order move the court to issue an order requiring the defendant to show cause why he should not be held in 'civil contempt' and sanctioned for his noncompliance. *See also Wyatt v. Rogers,* 92 F.3d 1074, 1078 n. 8 (11th Cir.1996).

Because the issue presented here is a violation of court orders, it is arguable that, under *Newman,* the plaintiffs should have filed a motion for civil contempt rather than a motion for injunctive relief. The resolution of this issue is, however, complicated, by the following circumstances: First, as stated, it apparent that the grievance settlements must not be allowed to go forward. To allow such would not only perpetuate the very secretive and closed practices that consent decree I was intended to eliminate and prohibit, it would allow the discriminatory, often racial, results of those past practices to be memorialized as well. Second, consent decree I expressly provides that the "parties have the right to seek to enforce the provisions of the Decree by filing motions with the Court," and may seek "further relief from the Court," not just as a civil sanction for violations of its provisions, but also to achieve "the intent and purpose for which it has been entered" to the extent the decree itself fails to "achieve" such.[79] It could thus be argued

---

**78.** *See* Defendants' motion for modification of court's orders concerning SPD validation projects, filed June 11, 1997 (Doc. no.1980).

**79.** Article XIX, ¶ 6, provides:

"(c) The parties will have the right to seek to enforce the provisions of this Decree by filing motions with the Court. The provisions of this Decree, and the issues challenged in the case, have been premised upon the existence of the prior remedies ordered in the Frazer/Ballard case and, to the extent that any future acts or omissions violate the remedies ordered in Frazer/Ballard, the plaintiffs will be entitled to enforce such remedies in this case in the same way that they are entitled to enforce the remedies of any other provision of this Decree. (d) It is the intent and purpose of this Decree to undo the effects of the past practices which have been the subject of this case and Decree and to prevent further practices which may perpetuate such efforts or otherwise discriminate against the plaintiffs or the class they represent. To the extent that this Decree fails to achieve the intent and purpose for which it has been entered, the parties may seek further relief from the Court."

that the parties are not limited by *Newman*'s civil contempt restrictions. Third and finally, the defendants have not themselves raised the issue of whether the plaintiffs should have filed a motion for civil contempt pursuant to *Newman*, and thus it is arguable that the issue has been waived.

But while these circumstances could reasonably support the entry of a permanent injunction despite *Newman*, the court believes it should proceed cautiously and conservatively. The court will therefore limit the relief to declaratory relief, with the added condition that the court will require the plaintiffs to recast the proceedings into a civil contempt context if the defendants object, within 14 days, to the current manner in which the plaintiffs have proceeded. The court has decided to take this tack for several reasons. First, because it was the defendants who first brought to the attention of the court the matter of whether certain employees and supervisors were entering into improper grievance settlements, it is apparent that the defendants are, like the plaintiffs, concerned that the procedure be applied in a manner consistent with court orders.[80] Under these circumstances, injunctive relief is unnecessary; a declaration is sufficient. *Cf. Wooley v. Maynard*, 430 U.S. 705, 711 97 S.Ct. 1428, 1433–34 (1977) ("although [o]rdinarily ... the practical effect of injunctive and declaratory relief will be virtually identical, a district court can generally protect the interests of a federal plaintiff by entering a declaratory judgment, and therefore the stronger injunctive medicine will be unnecessary") (internal quotation marks and citations

omitted). Second, the recasting of these proceedings into a civil contempt context could be done easily. The issue has been well briefed, and all the relevant evidence has been submitted. Moreover, because the relief sought is more prohibitory than affirmative, the recasting would essentially be more one of form than substance, with the court imposing a civil sanction should the defendants proceed further with challenged grievances, rather than a permanent injunction prohibiting these actions. Third, the declaration entered by the court today would further facilitate the recasting by making clear to the parties what the court perceives to be the disputed issue.[81]

## III. CONCLUSION

The court cannot overlook that this is the second time that the defendants and Adams intervenors have tried to get the court to allow the wholesale selection of persons for provisional or permanent promotion other than under an open and competitive procedure. Previously, in a memorandum opinion entered on June 19, 1997, the court rejected their effort for the reclassification of upwards to 800 employees under the procedures of article XV.[82] The court held that the reclassifications must be strictly limited to those eligible employees working out of class at the time of the time of the entry consent decree I in 1994. The court explained that the expanded reclassification, as sought by defendants and the Adams intervenors, would "permit[] precisely the type of noncompetitive, hand-selection and favoritism that was

**80.** In *Newman*, the appellate court also dispensed with the concern that, because a need for wilfulness would most often preclude a finding of civil contempt, adequate civil enforcement would be difficult. The court wrote: "At oral argument, counsel for the State suggested that an adjudication of contempt would never be appropriate in this case because the State's good faith efforts at compliance with the consent decree would preclude a finding of wilfulness which, according to the State, is a necessary element of civil contempt. The Supreme Court long ago disposed of this contention: 'The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance....

Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act.' *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) (citations omitted)." 683 F.2d at 1318 n. 16.

**81.** With the declaratory relief entered today, the preliminary injunction entered April 9, 1997 (Doc. no. 1760), is no longer necessary. However, because the defendants and the Adams intervenors have appealed that injunction to the Eleventh Circuit Court of Appeals (Doc. nos. 1801 & 1803), the court cannot vacate it. The court will, however, vacate it upon remand.

**82.** Memorandum opinion, entered June 19, 1997 (Doc. no.1941).

to be abolished and protected against by the decree."[83]

With the proposed private grievance settlements, the Adams intervenors are essentially seeking again to circumvent open and fair competition for jobs in the Transportation Department. What the court said in its June 19, 1997, memorandum opinion applies with equal force to this effort: It would "permit[] precisely the type of noncompetitive, hand-selection and favoritism that was to be abolished and protected against by the decree."[84]

All parties to this litigation must understand that when it comes to selection for jobs in the Alabama Department of Transportation, this court will initially default in favor of a procedure that allows for open and fair competition. Any effort to convince the court otherwise will always be an uphill one. Therefore, the faster the Transportation Department and the Personnel Department can get such an open and competitive procedure in place for all selections, the better off all will be.

Accordingly, it is the ORDER, JUDGMENT and DECREE of the court that the plaintiffs' motions for permanent injunctions, filed March 10, 1997 (Doc. no. 1635) (treated as a motion for permanent injunction by order entered on March 11, 1997 (Doc. no. 1643)), and March 28, 1997 (Doc. no. 1716) (treated as motion for permanent injunction by order entered March 31, 1997 (Doc. no. 1726)) are granted to the extent that it is declared as follows: Provisionally appointing, promoting, or paying backpay to employees Andrew McCullough, Michael Grant, and John D'Arville pursuant to the grievances they filed would violate the consent decree entered on March 16, 1994 (Doc. no. 553) and the orders entered in *United States v. Frazer*, civil action no. 2709–N (M.D.Ala.).

It is further ORDERED that, unless defendants Alabama Department of Transportation and Alabama State Personnel Department note an objection within 14 days, the court will assume that they do not wish that these proceedings be recast as civil contempt proceedings.